**SO ORDERED.**

**SIGNED this 14 day of September, 2017.**



_____
**David M. Warren**
**United States Bankruptcy Judge**

_____

### UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF NORTH CAROLINA
### NEW BERN DIVISION

IN RE:                                                              CASE NO. 17-00067-5-DMW

**SIDNEY RAY PRICE III**
**MANDY ROSS PRICE**                                     CHAPTER 13

       DEBTORS

### ORDER GRANTING RELIEF FROM INTERIM ORDER AND
### DENYING MOTION FOR RELIEF FROM AUTOMATIC STAY

The matters before the court are the Motion for Relief from Automatic Stay ("Stay Motion") filed by Peak Leasing, LLC ("Peak") on January 30, 2017 and the Emergency Motion to Reconsider Interim Order Denying Motion for Relief from the Automatic Stay or, in the Alternative, to Reinstate the Automatic Stay ("Reconsideration Motion") filed by Sidney Ray Price III and Mandy Ross Price ("Debtors") on June 15, 2017.  The court conducted interim hearings on the Stay Motion on March 23, 2017 in Raleigh, North Carolina and on April 19, 2017 in New Bern North Carolina.  On June 26, 2017, the court conducted a final hearing on the Stay Motion, including the Reconsideration Motion, in Raleigh, North Carolina.  David J. Haidt, Esq. appeared for Peak, Adrian M. Lapas, Esq. appeared for the Debtors, and Chapter 13 trustee Joseph A. Bledsoe III, Esq. ("Trustee") appeared by telephone on behalf of the estate.  Based upon the

evidence presented and arguments of counsel, the court makes the following findings of fact and conclusions of law:

## BACKGROUND

1.  The Debtors filed a voluntary petition for relief under Chapter 13 of the United States Bankruptcy Code on January 5, 2017, and the court appointed the Trustee to administer the estate pursuant to 11 U.S.C. § 1302.

2.  Prior to the Debtors' petition, the male Debtor executed four Lease Agreements on May 4, 2015, June 2, 2015, July 6, 2015, and November 4, 2015, respectively, pursuant to which he agreed to lease from Peak the following equipment:

    a.  2008 Timpte Hopper Bottom Trailer for $225.00 per week for an initial lease term of 182 weeks;

    b.  2011 Timpte Hopper Bottom Trailer for $245.00 per week for an initial lease term of 208 weeks;

    c.  1998 Wilson Hopper Bottom Trailer for $198.00 per week for an initial lease term of 130 weeks; and

    d.  2010 Wilson Hopper Bottom Trailer for $249.00 per week for an initial lease term of 208 weeks.

3.  With the exception of the descriptions of leased equipment, initial lease terms, and weekly payment amounts, the Lease Agreements are identical and drafted upon a form provided by Peak.  The Lease Agreements each contain, *inter alia*, the following provisions:

> **DEFAULT:** If LESSEE fails to pay when due any rent or other amount required herein to be paid to LESSOR by LESSEE, or if LESSEE fails to perform any other provision hereof within (10) days after LESSOR shall have demanded in writing performance thereof . . . LESSOR shall have the right, but shall not be obligated, to exercise any one or more of the following remedies:  (a) to sue for and recover all rents and other amounts then due and thereafter accruing under this LEASE, (b)

2

to take possession of any and all of the EQUIPMENT . . . (c) to sell any or all of the items of the EQUIPMENT at public or private sale upon such terms as LESSOR deems advisable, and . . . (d) pursue any other remedy now or hereafter existing at law or in equity.

Notwithstanding any such action that LESSOR may take, including taking possession of any or all of the EQUIPMENT, LESSEE shall remain liable for the full performance of all its obligations hereunder. . . .

**SURRENDER:** On or before the expiration or earlier termination of this LEASE by LESSOR, LESSEE, at its expense shall return the EQUIPMENT in good condition and repair . . . .

**RENEWAL:** Upon expiration of the original term of the LEASE, the LEASE will automatically renew on a week to week basis without the necessity of execution of new documents and shall continue from week to week under the same terms and conditions until terminated by LESSOR or LESSEE upon thirty days prior written notice to the other.

4. Each of the Lease Agreements is supplemented by an attached Purchase Option

executed by both the male Debtor and Peak and which provides as follows:

The above referenced lessor ("Lessor") hereby agrees that if Lessee maintains its account with Lessor in good order and makes prompt and timely payments, after all sums owed to Lessor have been paid in full, Lessee may purchase the above Equipment "AS IS", "WHERE IS" at the end of the lease term for:

(Check on applicable box. If no box is checked or if more than one box is checked, the Fair Market Value Purchase Option will apply.)

☒ Fixed Price Purchase Option of $1.00; or

☐ Fair Market Value Purchase Option; or

☐ Fair Market Value Purchase Option Not to Exceed _____% of the Total Cash Price; or

☐ Other: _____

plus applicable taxes and fees.

As reflected above, on each Purchase Option, the "Fixed Price Purchase Option of $1.00" is selected.

3

5. At the time Peak filed the Stay Motion, Peak had not received any post-petition payments due under the Lease Agreements. Peak requested relief from the automatic stay imposed by 11 U.S.C. § 362 to allow it to take possession of the leased trailers. In response, the Debtors asserted that the Lease Agreements qualify as security agreements pursuant to N.C. Gen. Stat. § 25-1-203, and Peak should be treated as a secured creditor rather than a lessor.

6. The Debtors' Chapter 13 Plan ("Plan") filed on February 21, 2017[1] requires the Debtors to make monthly payments to the Trustee in the amount of $500.00 for two months followed by $1,075.00 for fifty-seven months. The Plan proposes to surrender the 2008 Timpte Hopper Bottom Trailer and provide Peak with a secured claim in the amount of $40,000.00, the Debtors' asserted value of the remaining trailers ("Trailers"), with the balance due under the Lease Agreements being allowed as an unsecured claim.

7. On March 17, 2017, Peak filed a Proof of Claim reflecting that the aggregate amount due under the Lease Agreements at the time of the Debtors' petition was $132,026.00, including a pre-petition arrearage in the amount of $10,187.00.

8. After the initial hearing on the Stay Motion, the court entered on March 23, 2107 an Order Allowing in Part and Continuing in Part Hearing on Motion for Relief from Automatic Stay and Requiring Trustee to Disburse Adequate Protection Payment which granted Peak relief from the automatic stay with respect to the 2008 Timpte Hopper Bottom Trailer and continued the hearing with respect to the Lease Agreements for the retained Trailers. This order also directed the Trustee to disburse the amount of $1,384.00 to Peak as adequate protection. On April 4, 2017, the Trustee filed a Trustee's Report which advised the court that the Trustee disbursed $460.00 to

---

[1] Subsequent to the court's ruling announced at the hearing on June 26, 2017 but before entry of this order, the Debtors filed an Amended Chapter 13 Plan on July 25, 2017.

4

Peak on March 28, 2017 but had not collected adequate funds to allow for full payment of the ordered disbursement.

9.     At the second hearing on the Stay Motion, Peak and the Debtors argued their respective positions regarding whether the Lease Agreements are true leases or qualify as security agreements under N.C. Gen. Stat. § 25-1-203, and the Trustee agreed with the Debtors that the Lease Agreements are disguised security agreements, rather than true leases.  The court took this issue under advisement but ruled that unless and until the Lease Agreements are determined to be security agreements, the Debtors are obligated to make the contractual weekly payments in the total amount of $692.00 for the use of the Trailers.  On April 21, 2017, the court entered an Order Continuing Hearing and Requiring Adequate Protection ("Interim Order") which continued its hearing on the Stay Motion until June 22, 2017[2] and directed the Debtors to make the weekly payments due under the Lease Agreements and maintain insurance on the Trailers.  The Interim Order provides that "[i]n the event that the Debtors fail to comply with any provision of this Order, then the automatic stay imposed by 11 U.S.C. § 362 shall be immediately modified without further notice or hearing to allow Peak to take possession of the Trailers."

10.    In the Reconsideration Motion, the Debtors represented that they initially made timely the first several weekly payments due under the Interim Order but were three days late on the payment due on May 31, 2017 and then five days late on the payment due on June 5, 2017.  Peak accepted these late payments, but in a letter from Peak's counsel to the Debtors' counsel dated June 14, 2017, Peak demanded possession of the Trailers, because the Debtors' default under the terms of the Interim Order resulted in termination of the automatic stay.  The Debtors, who continue to assert that the Lease Agreements are actually security agreements, stated that the

---

[2] Upon motion of Peak, the court entered on June 20, 2017 an Order Continuing Hearing which further continued the hearing until June 26, 2017.

5

adequate protection payments caused a tremendous economic and financial strain, as these payments were in excess of their obligations under the Plan.

11.     The Debtors are seeking relief from the effects of the Interim Order in two respects. First, the Debtors request the court to reconsider the provisions of the Interim Order which led to the modification of the automatic stay. Alternatively, the Debtors request the court to reinstate the automatic stay until final resolution of the Stay Motion, including determination of the appropriate classification of the Lease Agreements.

## DISCUSSION

### Jurisdiction

12.     The Stay Motion is a core proceeding as stated in 28 U.S.C. § 157(b)(2)(G), and the court has the authority to hear and determine the Stay Motion pursuant to 28 U.S.C. § 157(b)(1). The issues underlying the Reconsideration Motion involve the core Stay Motion; therefore, the court also has the authority to hear and determine the Reconsideration Motion. *In re Kim*, 384 B.R. 188, 189 (Bankr. N.D. Ohio 2007).

13.     The court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157(a) and 1334 and the General Order of Reference entered August 3, 1984 by the United States District Court for the Eastern District of North Carolina.

### True Lease Versus Disguised Security Agreement

14.     During the pendency of the Interim Order, the court was in the process of considering the issue of whether the Lease Agreements are true leases or qualify as security agreements. The Debtors' default under the terms of the Interim Order and resulting termination of the automatic stay effectively moot the Stay Motion and make resolution of this issue unnecessary, unless the court grants the Reconsideration Motion. Nevertheless, the court will first

address the proper classification of the Lease Agreements, because this determination will affect whether granting relief under the Reconsideration Motion is appropriate.

15. Proper classification of a purported lease is important, because the Bankruptcy Code recognizes a distinction between a lease and a secured transaction and allows for different types of treatment for the respective claims of a lessor and a secured creditor. *See WorldCom, Inc. v. Gen. Elec. Global Asset Mgmt. Servs. (In re WorldCom, Inc.)*, 339 B.R. 56, 63 (Bankr. S.D.N.Y. 2006).

*Treatment of True Leases in Chapter 13*

a. In a Chapter 13 case, a plan may, subject to 11 U.S.C. § 365, "provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section." 11 U.S.C. § 1322(b)(7).[3] Pursuant to 11 U.S.C. § 365(d)(2), an unexpired lease of personal property may generally be assumed or rejected any time prior to confirmation.

b. A Chapter 13 debtor-lessee may not assume an unexpired lease that is in default at the time of the petition unless the debtor-lessee "first (1) cures, or provides adequate assurance to promptly cure, any defaults under the lease, (2) compensates, or provides adequate assurance to promptly compensate, a party to the lease for the actual pecuniary loss resulting from such default, and (3) provides adequate assurance of future performance under the lease." *In re Adams*, Case No. 98-03493-8-JRL, 1998 Bankr. LEXIS 1591, at *4 (Bankr. E.D.N.C. Nov. 24, 1998) (citing 11 U.S.C. § 365(b)(1)).

---

[3] While 11 U.S.C. § 365 authorizes the *trustee* to assume or reject an executory contract or unexpired lease, a Chapter 13 debtor is afforded this power through 11 U.S.C. § 1322(b)(7). *In re Adams*, Case No. 98-03493-8-JRL, 1998 Bankr. LEXIS 1591, at *2-3 (Bankr. E.D.N.C. Nov. 24, 1998).

7

c.  Although a Chapter 13 debtor may cure a pre-petition lease default through the plan, the local rules of this district provide that "[t]he debtor shall pay directly to the lessor all payments scheduled in a lease of personal property for that portion of the obligation that becomes due after the order for relief." E.D.N.C. LBR 3070-1(c)(1). The adequate protection payments directed in the Interim Order comply with this local rule.

d.  The interest of a true lessor is not subject to a trustee's "strong arm" power to avoid unperfected security interests for the benefit of the estate. *In re Grubbs Const. Co.*, 319 B.R. 698, 710 (Bankr. M.D. Fla. 2005) (citing 11 U.S.C. § 544(a)).

*Treatment of Claims Secured by Personal Property in Chapter 13*

e.  While the value of personal property subject to an assumed lease is immaterial in a Chapter 13 case, the value of personal property collateral securing a creditor's claim directly affects treatment of the claim. The Bankruptcy Code provides that—

> [a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim.

11 U.S.C. § 506(a)(1). "In other words, strictly for purposes of determining the amount and classification of a creditor's claim, a claim is secured to the value of the collateral, and unsecured for the balance." *Hurlburt v. Black (In re Hurlburt)*, Case No. 16-01964-5-SWH, 2017 WL 2483724, at *3, 2017 Bankr. LEXIS 1534, at *7 (Bankr. E.D.N.C. June 7, 2017).

f.  A Chapter 13 plan may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence . . . ." 11 U.S.C. § 1322(b)(2). A Chapter 13 debtor may thus bifurcate

8

a creditor's claim secured by personal property into secured and unsecured amounts based upon the value of the collateral as determined under 11 U.S.C. § 506(a). *Id.* The Plan proposes to treat the Lease Agreements as security agreements, value the Trailers at $40,000.00 pursuant to 11 U.S.C. § 506(a), and accordingly, bifurcate Peak's claim pursuant to 11 U.S.C. § 1322(b)(2).

16. When considering whether an agreement is to be characterized as a lease or a security agreement for purposes of treatment under the Bankruptcy Code, the court must look to applicable state law. *WorldCom*, 339 B.R. at 63 (citing *Butner v. United States*, 440 U.S. 48, 54, 99 S. Ct. 914, 918, 59 L.Ed.2d 136 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law")). In North Carolina, resolution of this issue is governed by its adoption of the Uniform Commercial Code ("UCC") set forth in N.C. Gen. Stat. § 25-1-101 *et seq.*, but the court may consider case law from other state and federal courts interpreting this uniform law. *Id.* at 63-64 (citations omitted); *see also In re Lash*, Case No. 10-51171, 2010 WL 5141760, at *3, 2010 Bankr. LEXIS 4490, at *9 (Bankr. M.D.N.C. Dec. 9, 2010) (finding that "[i]t is a well-accepted practice for courts faced with the true lease versus security interest issue to look to relevant decisions from other jurisdictions, since the Uniform Commercial Code has been adopted in all 50 states, and its purpose is to achieve uniformity.").

17. By challenging the nature of the Lease Agreements, the Debtors bear the burden of proving that they are, in fact, security agreements. *In re Johnson*, Case No. 17-00218-5-JNC, 2017 WL 2189553, at *2, 2017 Bankr. LEXIS 1339, at *6 (Bankr. E.D.N.C. May 17, 2017) (citing *Sunshine Heifers, LLC v. Citizens First Bank (In re Purdy)*, 763 F.3d 513, 519 (6th Cir. 2014)).

18. In *Johnson*, this court recently analyzed the statutory criteria for deeming a lease a secured transaction and noted that—

> [g]enerally speaking, a lease invokes only temporary possession of the item at hand and the possessing party is contractually obligated to return the subject good or property to the owner "'with some expected residual interest of value remaining at the end of the lease term.'" *In re QDS Components, Inc.*, 292 B.R. 313, 322 (Bankr. S.D. Ohio 2002) (quoting James J. White & Robert S. Summers, *Uniform Commercial Code*, vol. 4, § 30-3 (5th ed., West 2002)). A sale of a good, on the other hand, passes ownership title to the possessing party without condition or retention of ownership interest even if the item is pledged back. The collateralization of the item does not defeat ownership, as "'a security interest is only an inchoate interest contingent on default and limited to the remaining secured debt.'" *Id.* (citations omitted); *see also Purdy*, 763 F.3d at 518.

*Id.* at *2, 2017 Bankr. LEXIS, at **6-7.

19. Section 1-203 of the UCC, titled "Lease distinguished from security interest," is devoted entirely to this evaluation but cautions that "[w]hether a transaction in the form of a lease creates a lease or security interest is determined by the facts of each case." N.C. Gen. Stat. § 25-1-203(a) (2006). In determining whether a lease is a true lease, the form or title of the agreement is not determinative. *Grubbs Const.*, 319 B.R. at 714 (citations omitted).

*The UCC Bright-Line Test*

20. The facts surrounding a purported lease are first applied to the UCC statutory provision known as the "Bright-Line Test," and if the criteria of the Bright-Line Test are satisfied, then the lease is classified as a security agreement as a matter of law. *Johnson*, 2017 WL 2189553, at *3, 2017 Bankr. LEXIS 1339, at *9. The Bright-Line Test provides as follows:

> A transaction in the form of a lease creates a security interest if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee, and:
>
> > (1) The original term of the lease is equal to or greater than the remaining economic life of the goods;
> >
> > (2) The lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;

10

>    (3) The lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement; or
>
>    (4) The lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement.

N.C. Gen. Stat. § 25-1-203(b) (2006). The Bright-Line Test is thus a two-part test, and to be deemed a security agreement under the Bright-Line Test, a purported lease is not subject to termination by the lessee *and* one of the four enumerated conditions is satisfied. *Johnson*, 2017 WL 2189553, at *3, 2017 Bankr. LEXIS 1339, at *9 (citing *In re Se. Materials, Inc.*, 433 B.R. 177, 181 (Bankr. M.D.N.C. 2010)); *see also Lash*, 2010 WL 5141760, at *4, 2010 Bankr. LEXIS 4490, at *10.

21.  The court finds no provision that expressly allows the male Debtor, as lessee, to terminate a Lease Agreement prior to the expiration of its initial lease term, and the "Surrender" section suggests that only Peak, as lessor, has the option to terminate prior to such expiration. Termination by the male Debtor is allowed only under the "Renewal" section in the event he opts to renew the Lease Agreement on a week-to-week basis after expiration of the initial lease term.[4] Further, a default by the male Debtor during the lease term resulting in Peak taking possession of the Trailers does not relieve the male Debtor of his obligation to make weekly rental payments to Peak. Interpreting these provisions in tandem, the court concludes that the consideration that the male Debtor is required to pay Peak under the Lease Agreements for the right to possession and use of the Trailers for their respective terms is not subject to termination by the male Debtor, thus the first prong of the Bright-Line Test is satisfied.

---

[4] As explained *infra*, the male Debtor also has the option to purchase each of the Trailers for one dollar at the ends of their initial lease term; therefore, the ability to terminate a Lease Agreement after renewal is essentially meaningless. The male Debtor would hardly opt to renew a Lease Agreement and continue making weekly payments when he can own the leased Trailer for payment of one dollar.

11

22.     With the first required element of the Bright-Line Test met, the court must render the Lease Agreements to be disguised security agreements if any one of the four enumerated conditions of N.C. Gen. Stat. § 25-1-203(b) exists.  These factors are often referred to as the "Residual Value Factors" and focus on whether the lessor retains any residual interest in the leased property. *WorldCom*, 339 B.R. at 65 (citations omitted).  In each of the four instances, at the end of the lease, the leased property either no longer has any economic value, or the lessee has the right to obtain ownership of the property for no or nominal additional consideration. *Grubbs Const.*, 319 B.R. at 714.

23.     The Debtors assert that the one dollar purchase option at the expiration of each Lease Agreement constitutes "nominal consideration" within the meaning of N.C. Gen. Stat. § 25-1-203(b)(4).  The UCC defines this term as follows:  "Additional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised." N.C. Gen. Stat. § 25-1-203(d) (2006).  At the end of a Lease Agreement, the male Debtor has two options if he desires to retain the leased Trailer.  He may either renew the Lease Agreement by continuing to make weekly payments or purchase the leased Trailer for one dollar.  The purchase option is unquestionably less than the cost of continued performance under a renewal.

24.     The North Carolina Court of Appeals held that an agreement similar to the Lease Agreements which gave the lessee the option, upon termination of the lease, to purchase the leased equipment for one dollar was an option to purchase for nominal consideration and "precisely the type of transaction anticipated by [the UCC] and defined thereunder as a security interest, not a lease." *L.C. Williams Oil Co. v. NAFCO Capital Corp.*, 130 N.C. App. 286, 290-91, 502 S.E.2d

415, 418 (1998).[5]  Likewise in the case *sub judice*, upon a successful completion of the initial lease terms, the male Debtor has an option to become the owner of the Trailers for the "nominal additional consideration" of one dollar, thereby satisfying N.C. Gen. Stat. § 25-1-203(b)(4) and the second part of the Bright-Line Test.

25.     If the Bright-Line Test fails, then a court must engage in a contextual analysis to determine whether the facts of the case evidence the creation of a security arrangement or a true lease. *WordCom*, 339 B.R. at 70.  The court must look to the economic realities surrounding the transaction in question. *Johnson*, 2017 WL 2189553, at *4, 2017 Bankr. LEXIS 1339, at *10.  With the Bright-Line test fully satisfied, the court need not undertake this analysis and concludes as a matter of law that the Lease Agreements are not true leases, but rather security agreements to finance the purchase of the Trailers.

## Automatic Stay

26.     Before the court considers whether it should reconsider the defaulted Interim Order or reinstate the automatic stay, the court contemplates whether, absent the Debtors' default, Peak would be entitled to relief from the automatic stay in light of the court's determination that the Lease Agreements are actually security agreements.  If the requested relief is appropriate despite this reclassification, then it would be fruitless to disturb the current modification of the automatic stay.

27.     Upon the filing of a bankruptcy petition, the automatic stay imposed by 11 U.S.C. § 362(a) operates to stay "any act to collect, assess, or recover a claim against the debtor that arose

---

[5] This case is based on a prior version of the UCC under which a lease agreement that provides the lessee with the option to become the owner of the leased property for no additional consideration or nominal consideration is conclusively a security agreement.  Although the current UCC's Bright-Line Test requires additionally that the lease not be subject to termination by the lessee, prior interpretations of the meaning of "nominal consideration" remain valid.

before the commencement of the case . . . ." 11 U.S.C. § 362(a)(6). "The automatic stay is a bedrock principle upon which the Code is built; the importance of § 362 cannot be over-emphasized." *In re Seaton*, 462 B.R. 582, 591 (E.D. Va. 2011) (citing *Grady v. A.H. Robins Co.*, 839 F.2d 198, 200 (4th Cir. 1988)). In *Grady*, the United States Court of Appeals for the Fourth Circuit found the legislative history of the automatic stay to reveal its importance:

> The automatic stay is one of the fundamental debtor protections provided by bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to *attempt a repayment or reorganization plan*, or simply to be relieved of the financial pressures that drove him into bankruptcy.

*Grady*, 839 F.2d at 200 (quoting House Report No. 95-595, 95th Cong. 1st Sess. 340-1 (1977); Senate Report No. 95-989, 95th Cong. 2d Sess. 54-55 (1978); reprinted in 1978 U.S.Code Cong. & Adm. News 5787 at 5840 and 6296-97) (emphasis added).

28. The Plan proposes to bifurcate Peak's aggregate claim under the Lease Agreements into a secured claim for $40,000.00 to be paid through the Plan, with the balance being allowed as a general unsecured claim. The Plan requires the Debtors to make monthly payments to the Trustee in the amount of $500.00 for two months followed by $1,075.00 for fifty-seven months. This amount is far less than the direct weekly payments of $692.00 that were required under the Lease Agreements. If the Debtors had remained current with the weekly payments under the terms of the Interim Order, then the court would now find the reclassification of the Lease Agreements as security agreements to be cause for denying the Stay Motion, discontinuing direct payments to Peak, and allowing the Debtors a fair attempt to satisfy its indebtedness to Peak through the Plan; therefore, the court will adjudicate the Reconsideration Motion.

Rule 60(b)

29. A court may reconsider its own order granting relief from the automatic stay pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, incorporated by Rule 9024 of the Federal Rules of Bankruptcy Procedure. *Rodriguez Camacho v. Doral Fin. Corp. (In re Rodriguez Camacho)*, 361 B.R. 294, 300 (B.A.P. 1st Cir. 2007). Rule 60(b) provides grounds for relief from a final judgment, order, or proceeding and reads as follows:

> On motion and just terms, the court may relieve a party or its legal representative from a *final* judgment, order, or proceeding for the following reasons:
>
> (1) mistake, inadvertence, surprise, or excusable neglect;
>
> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
>
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
>
> (4) the judgment is void;
>
> (5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
>
> (6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b); Fed. R. Bankr. P. 9024 (emphasis added). Although the Interim Order was intended as an interim order on the Stay Motion pending the court's resolution of the proper characterization of the Lease Agreements, the Interim Order became a final adjudication upon the Debtors' default of the adequate protection payments causing the automatic stay to be modified. *See Rodriguez Camacho*, 361 B.R. at 299 (citations omitted) (holding that an order granting relief from the automatic stay is final).

30. In this jurisdiction, consideration of a Rule 60(b) motion proceeds in two stages. *Nat'l Credit Union Admin. Bd. v. Gray*, 1 F.3d 262, 264 (4th Cir. 1993). First, the movant must

satisfy each of the following three threshold conditions established by the United States Court of Appeals for the Fourth Circuit: (1) that the motion is timely; (2) that the movant has a meritorious defense to the action; and (3) that the opposing party would not be unfairly prejudiced by having the judgment set aside. *Id.* (citing *Park Corp. v. Lexington Ins. Co.*, 812 F.2d 894, 896 (4th Cir. 1987)). After meeting these threshold conditions, the movant must satisfy one of the six grounds for relief enumerated in Rule 60(b). *Id.* at 266.

31. The court finds that the Debtors have satisfied all three of the threshold conditions for relief under Rule 60(b).

   a. "A motion under Rule 60(b) must be made within a reasonable time . . . ." Fed. R. Civ. P. 60(c)(1); Fed. R. Bankr. P. 9024. The Debtors filed the Reconsideration Motion during the pendency of the Stay Motion and almost immediately after they defaulted under the Interim Order, and Peak demanded return of the Trailers. The timing of the Reconsideration is undoubtedly reasonable.

   b. To prove a meritorious claim or defense, a movant under Rule 60(b) does not need to show likelihood of success but must make allegations that, if established, would constitute a valid claim or defense. *Holland v. Virginia Lee Co., Inc.*, 188 F.R.D. 241, 249 (W.D. Va. 1999) (citations omitted). The Debtors have all along contended that Lease Agreements were disguised security agreements, which would entitle them to restructure the debt to Peak through their Plan and constitute cause for the court denying the Stay Motion. This allegation alone satisfies the Rule 60(b) threshold for a meritorious defense to the Stay Motion, but more importantly, the court ultimately agreed with the Debtors.

   c. Peak has not alleged any specific prejudice that will result if the Reconsideration Motion is granted. Contrarily, Peak is in a better position than if the court

16

initially characterized the Lease Agreements as security agreements and denied the Stay Motion, rather than ordering adequate protection payments. Despite the Debtors' default in timeliness, Peak received more in direct adequate protection payments than it might have received in that period through the Plan.

32. With all the threshold conditions of Rule 60(b) met with respect to the Interim Order, the court must now determine whether the Debtors have established one of the enumerated grounds for relief in Rule 60(b). Reasons (1) through (4) are outwardly not applicable; however, the court believes relief is warranted under reason (5) or, alternatively, reason (6).

*Rule 60(b)(5)*

a. Rule 60(b)(5) allows for relief from a judgment or order if, among other reasons, "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5); Fed R. Bankr. P. 9024. The United States Supreme Court interprets this provision to allow "a court to modify or vacate a judgment or order if 'a significant change in either factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'" *Horne v. Flores*, 557 U.S. 443, 447, 129 S. Ct. 2579, 2593, 174 L. Ed.2d 406 (2009) (quoting *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 384, 112 S. Ct. 748, 760, 116 L. Ed.2d 867 (1992)).

b. The United States Bankruptcy Court for the Southern District of Indiana focused on the words "equitable" and "prospective" within Rule 60(b)(5):

> The . . . final ground [of Rule 60(b)(5) ] . . . is based on the historic power of a court of equity to modify its decree in the light of changed circumstances . . . . Although the principal significance of this portion of the rule is with regard to injunctions, it is not confined to that form of relief, nor even to relief that historically would have been granted in courts of equity. Any such restriction would be inconsistent with the merger of law and equity. *Instead it applies to any judgment that has prospective effect as contrasted with those that offer a present remedy for a past wrong*.

*In re Willoughby*, 324 B.R. 66, 74 (Bankr. S.D. Ind. 2005) (quoting 11 Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2863, p. 336-37 (1995) (italics added)).

      c.      The court's determination that Lease Agreements are not true leases, but instead security agreements, relieves the male Debtor of the obligation to make contractual payments due under the Lease Agreements directly to Peak pursuant to 11 U.S.C. § 365 and E.D.N.C. LBR 3070-1(c)(1) and allows the Debtors to restructure the debt through their Plan pursuant to 11 U.S.C. §§ 506(a) and 1322(b)(2). The court necessarily awarded Peak adequate protection payments while the Stay Motion was under advisement; however, the "drop dead" provision of the Interim Order is no longer equitable, as it deprives the Debtors of a fair opportunity to confirm their Plan. The court finds prospective enforcement of the provision inequitable and detrimental to the public interest and will, therefore, modify this portion of the Interim Order pursuant to Rule 60(b)(5).

*Rule 60(b)(6)*

      d.      Rule 60(b)(6) allows for relief from a final judgment or order for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6); Fed. R. Bankr. 9024. "While this catchall reason includes few textual limitations, its context requires that it may be invoked in only 'extraordinary circumstances' when the reason for relief from judgment does not fall within the list of enumerated reasons given in Rule 60(b)(1) – (5). *Aikens v. Ingram*, 652 F.3d 496, 500 (4th Cir. 2011) (citing *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863 n. 11, 864, 108 S. Ct. 2194, 100 L. Ed.2d 855 (1988)). The court held *supra* that relief from the Interim Order is suitable under Rule 60(b)(5) but will nonetheless consider Rule 60(b)(6) in the alternative.

18

    e.  The court believes that the reclassification of the Lease Agreements to security agreements is an extraordinary circumstance entitling the Debtors to relief from the effects of the Interim Order, because this characterization allows for a vastly different treatment of Peak's claim in the Debtors' Chapter 13 case. To the extent that relief from the Interim Order is not appropriate under Rule 60(b)(5), a posture which the court rejects, then the court additionally grants relief under Rule 60(b)(6).

Injunctive Relief

33. A Rule 60(b) request for relief from an order modifying the automatic stay is, by definition, "a request for *reinstatement* of the *original* automatic stay." *Rodriguez Camacho*, 361 B.R. at 300 (emphasis in original). The result of the court granting the Debtors relief from the Interim Order is that the automatic stay continues in effect and was never modified; therefore, the Debtors' alternative request to reinstate the automatic stay is moot. The court notes, however, that a request to reimpose the automatic stay constitutes a plea for injunctive relief under 11 U.S.C. § 105(a)[6] which necessitates an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure, which includes as an adversary proceeding "a proceeding to obtain an injunction or other equitable relief . . . ." Fed. R. Bankr. P. 7001(7).[7] *See*, *e.g.*, *In re Wishon*, 410 B.R. 295, 307 (Bankr. D. Or. 2009); *In re Parker*, 154 B.R. 240, 243 (Bankr. S.D. Ohio 1993). Even if the court had denied the Rule 60(b) relief, the court could not consider the Debtors' request to reinstate the automatic stay, because it is not properly presented.

---

[6] "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

[7] By contrast, a Rule 60(b) motion to vacate an order lifting the automatic stay qualifies as a contested matter under Rule 9014 of the Federal Rules of Bankruptcy Procedure. *State Bank of So. Utah v. Gledhill (In re Gledhill)*, 76 F.3d 1070, 1079 (10th Cir. 1996).

## CONCLUSION

34. Under N.C. Gen. Stat. § 25-1-203, the Lease Agreements are security agreements, rather than true leases; therefore, applying the Interim Order prospectively is inequitable, and the court grants the Debtors relief from the Interim Order pursuant to Rule 60(b)(5) of the Federal Rules of Civil Procedure, incorporated by Rule 9024 of the Federal Rules of Bankruptcy Procedure. Any objections by Peak to the Plan's proposed treatment of its claim, including valuation of the Trailers, should be raised in the confirmation process. In the meantime, the Debtors are entitled to an opportunity to perform under the Plan, and relief from the automatic stay is not warranted at this time; now therefore,

IT IS ORDERED, ADJUDGED, AND DECREED as follows:

1. The Lease Agreements be, and hereby are, deemed to be security agreements for purposes of treatment in this Chapter 13 case;

2. The Reconsideration Motion be, and hereby is, allowed, and the Debtors are retroactively relieved of the provision of the Interim Order conditioning the continuance of the automatic stay upon timely adequate protection payments to Peak; and

3. The Stay Motion be, and hereby is, denied without prejudice.

**END OF DOCUMENT**